CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
10/17/2018
JULIA C. DUDLEY, CLERK
BY: S/J.Vasquez
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal Action No. 5:18-cr-00005-6 |
| v. ) | |
| ) | By: Elizabeth K. Dillon |
| ) | United States District Judge |
| JUDITH WRIGHT ) | |

**MEMORANDUM OPINION**

Defendant Judith Wright was charged, with five co-defendants, in a superseding indictment that contained eleven counts. Wright is named only in the first count, which charges her with conspiracy to distribute and to possess with intent to distribute cocaine. At a pretrial conference, the court considered several pending motions including Wright's motion to suppress, in which she requests that the court suppress certain evidence seized from a car she was driving on February 1, 2018, as well as statements that she made to law enforcement officers on that date. In her written motion, she also requests the suppression of certain cell phone records and bank records in the possession of the government. The motion was fully briefed, and the court held an evidentiary hearing on July 18, 2018. At the same hearing, the court made certain evidentiary rulings and took other portions of the motion to suppress under advisement. Additionally, at the conclusion of the evidentiary hearing, Wright's counsel withdrew some arguments previously made in the motion to suppress.[1]

The court turns first to a discussion of the relevant facts. It will then set forth the issues that were resolved at the hearing and its analysis of the remaining arguments in the motion to suppress.

---

[1] At the time Wright filed her motion, another co-defendant was also proceeding to trial, and he has since pleaded guilty. That has impacted, to some degree, the pending motion to suppress.

## I. FACTUAL BACKGROUND

On the morning of February 1, 2018, officers with the Northwest Regional Drug Task Force ("the Task Force") were conducting surveillance of a residence in Winchester where Judith Wright's two sisters—Effie Houghton and Vicky Houghton—resided, along with Lisa Vasquez-Ahumada and Blas Rodriguez-Avila, two of Wright's co-defendants. The officers had in hand a search warrant for the residence, which they intended to execute that same day. A Task Force officer also had felony arrest warrants for both Houghtons. The drug investigation that resulted in the issuance of those arrest warrants and search warrant had been ongoing for some time and involved numerous agencies and operations in at least two states.

The officers surveilling the residence saw Wright, Vicky Houghton, Lisa Vasquez-Ahumada, and a male (later identified as Rodriguez-Avila), leave the residence, place suitcases in the trunk of a 2006 Jeep, and drive away in the Jeep, with Wright driving. Concerned that the individuals might try to leave the area, the Task Force agents requested the Winchester Police Department to effect a traffic stop, if possible. Corporal Nixon, who was in the area at the time of the request, responded. Nixon is a member of the Winchester Police Department but described his role as being the uniformed presence for other agencies, such as the Task Force. After another officer relinquished his lead position behind the Jeep, Nixon began to follow the Jeep and noted that the third, middle brake light was not operating. Nixon then effected a traffic stop.

Nixon testified that, at the time he pulled the Jeep over, he knew that the Jeep was related to the drug investigation based on the details conveyed in the request to stop the car. He did not know, however, about either arrest warrant. He approached the car and told the driver, Wright, that he had pulled her over because her third brake light was not operational. He asked for

2

identification documents from all of the occupants and then returned to his car to run their identities. Dispatch immediately informed him that there was an active felony arrest warrant for Vicky Houghton for distribution of narcotics. Because he had been informed that the vehicle was connected to the larger drug investigation conducted by the Task Force, he also requested a canine unit to conduct an open air sniff of the Jeep. At around the same time and before Nixon returned to the vehicle, Detective Travis Medina, who was assigned to the Task Force with the state police, radioed Nixon and told him to keep an eye on the male, who was a possible target of the drug investigation.

Nixon then called for backup, returned to the Jeep, and explained to Houghton that there was a warrant for her arrest. She was arrested at that time. The drug dog, who had to be brought in from a neighboring jurisdiction, arrived approximately thirty-five minutes after the vehicle was stopped. During that time, the other occupants remained in the Jeep. The dog alerted to the vehicle and, specifically, to the rear passenger door, next to where Rodriguez-Avila was sitting. At that point, the officers asked the remaining occupants to step out of the Jeep, and they were handcuffed and detained. The officers on the scene had decided at that point to search the car, but they elected to wait until they could get a search warrant. After Detective Medina obtained the warrant from a state magistrate, he searched the vehicle, which took approximately ten minutes. He found two purses, each containing $6,000 in cash, one with identification belonging to Wright and one with identification belonging to Lisa Vasquez-Ahumada. He also seized two cell phones from the vehicle, including Wright's. No illegal narcotics were found.

In addition to seeking suppression of the evidence seized from the Jeep, Wright also seeks to suppress one statement she made during the course of the encounter. Specifically, after the dog alerted and the officers opened the doors to let everyone out so that they could be

3

handcuffed and detained pending the search, Nixon asked whether they were heading somewhere, apparently because the back of the Jeep contained luggage. Wright replied that they were going away to California. Nixon testified that he did not make further inquiries and that she did not make any other statements at that time. He gave Wright the *Miranda* warnings later, after that initial statement was made.[2] He believed he gave Wright the *Miranda* warnings while they were waiting for the search warrant for the Jeep. His testimony is substantially confirmed by the call logs from the dispatcher, which were introduced at the hearing. (Gov't Ex. 10.) According to that exhibit, the stop occurred at 10:36 a.m. The dog alerted at 11:17 a.m., and there is a notation at the same time that the officers "will be detaining all subjects." Nixon advised Wright of her *Miranda* rights at 12:58 p.m., according to the log. At that point, she was questioned by an officer with the Department of Homeland Security. Wright was not arrested on that day, although Wright received a traffic summons for the inoperable brake light. Indeed, after the search and subsequent questioning, Wright was later allowed to leave and to take her luggage (but not her cell phone or the cash) with her.

Additional facts will be discussed in context below.

## II. DISCUSSION

### A. Resolved Issues

The following issues were resolved, withdrawn, or ruled on by the court during the July 18, 2018 hearing.

First, with regard to the United States' motion in limine (Dkt. No. 111), the parties agree that there should be no reference to the potential or possible sentence or punishment that Wright

---

[2] The court notes that there was also testimony from a special agent with Homeland Security investigations, Kris Southwick, that Wright made a similar statement to him *after* being read her *Miranda* rights. She is no longer asking the court to suppress the later statements. Thus, the jury likely would hear the evidence despite this court's suppression of the pre-*Miranda* statement.

will receive if convicted, but defendant will be permitted to raise issues related to the sentencing or punishment of testifying witnesses, which could be relevant to those witnesses' credibility.

Second, with regard to the United States' notice under Federal Rule of Evidence 404(b) (Dkt. No. 113), the parties agree that evidence concerning Judith Wright's payment of a speeding ticket on a prior trip she made from California to Virginia should not be excluded.

Third, for the reasons discussed on the record at the hearing, the court denies Wright's motion to exclude documents containing basic call information and subscriber information related to her cell phone number that were obtained in response to third-party subpoenas. All of those records were obtained prior to the February 1, 2018 traffic stop challenged in her motion to suppress and without any search of her phone.[3]

Fourth, the court denies Wright's motion to exclude bank records that were received in response to grand jury subpoenas.

Fifth, as to any alleged co-conspirator statements, Wright requested that, before admitting into evidence any such statement, the court hold a hearing outside the presence of the jury requiring that the government establish the requirements for introduction of such a statement under Federal Rule of Evidence 801(d)(2)(E), specifically that: (1) a conspiracy existed; (2) the declarant and defendant were members of it; and (3) the statement was made in the course of, and in furtherance of, the conspiracy. (Rodriguez-Avila's Mot. Suppress, Dkt. No. 112 at 1 (citing *James v. United States*, 90 F.2d 575, 582 (5th Cir. 1979)); *see also* Wright's Mot. Suppress, Dkt. No. 110 at 16–17 (joining "in any motion filed by co-defendant Blas Rodriguez in issues that pertain to her").) As stated at the hearing, the court denies this request. The Fourth Circuit does not require a district court "to hold a hearing to determine whether a conspiracy

---

[3] The United States indicated that it did not intend to introduce any information obtained as a result of any search of Wright's cell phone itself, which was seized during the February 1, 2018 stop, although it had obtained written consent from Wright on that date to search her phone.

exists before admitting statements" under Rule 801(d)(2)(E). *United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013) (citing *United States v. Blevins*, 960 F.2d 1252, 1256 (4th Cir. 1992)); *see also United States v. Hines*, 717 F.2d 1481, 1488 (4th Cir. 1983) ("The district court safeguards the defendant's rights by being prepared to either declare a mistrial or to dismiss the case if the government fails to prove *aliunde* that a conspiracy existed."). Instead, the court will conditionally admit the statements subject to the government's subsequent satisfaction of the requirements for their admission.

Sixth, based on the evidence presented at the suppression hearing, Wright withdrew her argument to suppress any statements that she made after she was read her *Miranda* rights. Instead, with regard to statements she made on that day, she asks the court to suppress only one pre-*Miranda* statement that she made.[4] That remaining portion of her motion to suppress is discussed below.

Seventh, with regard to the evidence recovered from the car (which included Wright's cell phone and substantial sums of cash in her purse and the purse of a second occupant), counsel withdrew a number of arguments originally advanced in the motion to suppress. For example— and although the argument was contained in the motion—counsel conceded at the conclusion of the testimony that there was no evidence that the initial reason for the traffic stop—that the brake light was not working—was false. So, that grounds for suppression was withdrawn. Wright also withdrew any challenge to the search on the grounds that it was a warrantless search, in light of the evidence that the search did not occur until a state search warrant had been obtained. But Wright's counsel asked the court to keep open her challenge to the reliability of the drug-sniffing

---

[4] In the parties' briefing, there was some reference to a possible statement made by Wright when Nixon first approached the car, stating that she knew her brake light was out. When Nixon testified, however, he did not reference a statement by her to that effect. So that statement is not at issue. Nixon also testified that when he asked Wright, early on in the stop, if there was anything illegal in the car, she said no. Wright does not appear to be asking for the suppression of that statement, either.

dog who alerted on the car, because the alert provided at least part of the basis for the state-issued search warrant. It also appears that Wright continues to contend that, in the absence of a reliable dog alert and the resulting warrant, there was not probable cause to support the search. Thus, the court addresses that issue herein.

**B. Motion to Suppress**

The court turns next to the motion to suppress. For the reasons discussed in more detail below, the court will grant the motion to suppress Wright's pre-*Miranda* statement, but will deny the motion to suppress the evidence seized from the car.

**1. Wright's pre-*Miranda* statement**

The standards for the suppression of pre-*Miranda* statements are well established. The general rule is that "a person subjected to custodial interrogation is entitled to the procedural safeguards prescribed by *Miranda*, and therefore, any statements a suspect makes during custodial interrogation are inadmissible in the prosecution's case in chief unless prior *Miranda* warnings have been given." *United States v. Leshuck*, 65 F.3d 1105, 1108 (4th Cir. 1995). Generally, "[a] suspect is 'in custody' for *Miranda* purposes if the suspect has been formally arrested or if he is questioned under circumstances in which his freedom of action is curtailed 'of the degree associated with a formal arrest.'" *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam)).

To determine whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation and determine how a reasonable person "in the defendant's position would have understood his [or her] situation." *Id.* (internal quotation marks omitted); *see also Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (noting that the custody inquiry requires the court to gauge the breadth of the suspect's freedom of action).

7

Thus, the standard is an objective one, asking whether a reasonable person would feel free to leave, and neither the defendant's nor the officer's belief is relevant. *Stansbury*, 511 U.S. at 323–24. As a result, the fact that Nixon testified that Wright was "detained" and not free to leave after he handcuffed her is not relevant to the court's inquiry. *See id*.

As the *Leshuk* court explained, "[i]nstead of being distinguished by the absence of any restriction of liberty, *Terry* stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion." *Leshuk*, 65 F.3d at 1109. This is true because even during a valid *Terry* stop, a reasonable person would not feel free to leave. Thus, the Fourth Circuit has held that *Miranda* warnings are not required when a person is questioned during a routine vehicle stop or *Terry* stop, provided that the officer does not exceed the permissible scope of the *Terry* stop. *Id.* at 1108; *see also United States v. Hill*, 471 F. App'x 143, 155 (4th Cir. 2012) (explaining that where "the question is whether the seizure was an arrest or a *Terry* stop," the inquiry is governed by the standard set forth in *Leshuk*). In *Hill*, the court described the inquiry as having two parts, "one pertaining to time and the other to scope." 471 F. App'x at 154.

> First, the seizure must have "last[ed] no longer than necessary to verify or dispel the officer's suspicion." *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995) (citing *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (plurality opinion), and *United States v. Sinclair*, 983 F.2d 598, 602 (4th Cir. 1993)). Second, the actions of the officers must have been "necessary to protect their safety, maintain the status quo, and confirm or dispel their suspicions." *Id.* at 1110.

*Id.*

"In short, while a motorist during a routine traffic stop is detained and not free to leave, the motorist is not 'in custody' for *Miranda* purposes. . . . Instead, *Miranda* warnings are required only when the motorist is detained to an extent analogous to an arrest." *United States v.*

8

*Sullivan*, 138 F.3d 126, 130–31 (4th Cir. 1998); *see also Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) ("If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*.")

Defendant either did not challenge or withdrew any challenge to: the lawfulness of the stop; the existence of reasonable suspicion to request the canine unit; and the reasonableness of the thirty-five minutes it took for the dog to arrive. Thus, the sole question before the court as to the admissibility of Wright's pre-*Miranda* statement is whether she was "in custody" at the moment Nixon asked her about her travel plans, which occurred after the dog alerted and after she was handcuffed.

In this case, the court believes it is a close question whether Wright was detained to an extent analogous to an arrest. In particular, Nixon's question was posed at a time when it is unclear whether his suspicions had been verified or dispelled. Nonetheless, applying the *Leshuk* and *Sullivan* standards to the specific facts here, the court concludes that the lone question to Wright was posed while she was "in custody" for *Miranda* purposes and before she had been told of her rights.

The difficulty here is in the timing of Nixon's question. Once the dog alerted, Wright and the other occupants were all asked to step out of the car. From Nixon's testimony, immediately thereafter, Nixon inquired, "Are you heading somewhere?" based on the suitcases being present in the Jeep. Nixon clearly testified that Wright was in handcuffs at the time she responded that they planned to go away to California.[5] She did not say the purpose of her trip or make any other statements to Nixon, and he did not ask her any further questions.

---

[5] The statement is incriminating because California was the source of supply for the conspiracy and the United States contends that Wright had previously flown to California and driven back a car that contained cocaine.

9

The government argues that the question posed was part of a routine traffic stop. But this stop was not an ordinary traffic stop.[6] From the outset, Nixon knew the car had left a residence that was about to be searched as part of a wide-reaching drug investigation. He then learned of Houghton's arrest warrant, which was also for felony drug distribution. If Nixon had asked the same question of Wright before the dog arrived and had alerted and while Wright was still seated in the Jeep, the court likely would have concluded the statement was admissible.

But at the time Nixon asked the question, more than forty minutes had elapsed from the initial stop, the dog had alerted, and Wright had been asked to step out of the car and had been handcuffed.[7] Additionally, Nixon had told the occupants that the drug-sniffing dog had been requested due to suspicions related to illegal drugs. Another occupant of the car had been arrested before the dog alerted. It is unclear to the court whether Wright's identification had been returned, as there was no testimony about that. But at least one occupant's identification (Rodriguez-Avila's) had not been returned at that point, because Wright was shown it and asked about it later. Under the totality of those circumstances, the court concludes that, once Wright had been handcuffed, a reasonable person in her position would believe she was in custody when Nixon asked about her travel plans.

Moreover, it is worth noting that when Wright was handcuffed, she was either placed in a patrol car or taken to the side of the Jeep for a lengthy amount of time. Police officers watched her during that entire time and assisted her in using the bathroom. Indeed, she was handcuffed at approximately 11:17, but was not read her *Miranda* rights until more than an hour and a half

---

[6] This fact does not affect the validity of the initial stop. *United States v. Hassam El*, 5 F.3d 726, 729–30 (4th Cir. 1993) (reasoning that any traffic offense provides the reasonable suspicion required to stop a vehicle, even when the reason is pretextual).

[7] As noted, the defendant does not challenge—and the court does not find—that the length of that stop was unreasonable. *See, e.g.*, *United States v. McBride*, 676 F.3d 385, 393 (4th Cir. 2012) (concluding that a 55-minute period between the beginning of a detention and the arrival of the canine unit did not unreasonably prolong the stop).

later, at 12:58 p.m., shortly before she was interrogated at some length.  This length of detention clearly exceeded a typical or routine traffic or *Terry* stop.

In important respects, this case differs from cases like *United States v. Jones*, No. 7:16-cr-30026-13, 2017 WL 4873714 (W.D. Va. Oct. 27, 2017), in which the court denied a motion to suppress statements where the defendant had been detained for several hours before being interviewed and had been told at some point that she should not leave.  There, like here, the challenged statement was made in response to a question after a police dog had alerted.  There, the officers had discovered marijuana on the body of the other occupant of the vehicle; here, Houghton had been arrested.  In both cases, questions were posed at a time when the defendant was not free to leave.  Critically, though, in *Jones*, the court concluded that the detention lacked the "trapping of a formal arrest."  *Id.* at *5 *(quoting United States v. Manbeck*, 744 F.3d 360, 378 (4th Cir. 1984)).  It noted, in particular, that the defendant was not handcuffed and was left alone in the car with the keys.  She was permitted to drive the car to a restaurant or convenience store, either alone or accompanied by an officer, in order to use the restroom and/or buy something to drink.  She had her phone and was permitted to use her phone.  Before questioning her later, she was told she was not under arrest and was free to leave.  Additionally, earlier on in the stop she had consented to a search of the car.  *See generally id.*

Despite the initial similarities, the circumstances here were quite different.  Not only was Wright handcuffed at the time of the question, but she was not permitted to leave, nor was she ever told she was free to leave.  She was not left alone; instead, it appears that there was a constant police presence watching the Jeep and its occupants.  It further appears that Nixon had told them, at some point before the dog alerted, that either the vehicle or its occupants were suspected of having ties to drug activity.  Thus, although the officers had probable cause to

11

search the car, Wright was placed "in custody" at the point when she was handcuffed. The court recognizes that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest." *Leshuk*, 65 F.3d at 1109–10. But on the specific record here, when the question was asked while the suspect was in handcuffs, forty minutes after the initial stop, and after a drug dog had alerted, the court believes that the lawful stop had been converted to custody for *Miranda* purposes.

It is undisputed that Wright was not given *Miranda* warnings before Nixon's express question to her.[8] Her response to Nixon's interrogation is therefore inadmissible in the government's case-in-chief. Accordingly, the court will grant the motion to suppress that one statement.[9]

### 2. Search of the Jeep

As noted, Wright's only remaining challenge to the search of the vehicle is that the dog's unreliability meant that the dog's alert could not provide probable cause for the search. The court finds it unnecessary to reach that issue, however, because it concludes that, even without the dog's alert (which was the primary basis for the state search warrant), the officers had

---

[8] The court also recognizes the rule that an officer's questions are only interrogation if they are "reasonably likely to elicit an incriminating response." *United States v. Allen*, 13 F.3d 105, 109–10 (4th Cir. 1993). Here, Nixon described his question to Wright as merely a "casual conversation." But the United States has not argued to the court that Nixon's question was not interrogation on the ground that it was not intended to elicit incriminating information. And, in light of the entire factual situation and in the absence of any argument by the United States to the contrary, the court assumes that the question to Wright constituted interrogation.

[9] Although it plays no role in the court's ruling on this issue, the court strains to see how the court's ruling on the issue could affect the jury's decision at Wright's trial because she does not dispute the admissibility of almost the exact same statement made later that same day, after she was *Mirandized*. *See supra* note 2.

probable cause to search the Jeep.[10]

Warrantless searches of automobiles are authorized under the so-called automobile exception to the warrant requirement:

> Under the automobile exception, officers may search a vehicle without a warrant if the vehicle "'is readily mobile and probable cause exists to believe it contains contraband' or evidence of criminal activity." *United States v. Baker*, 719 F.3d 313, 319 (4th Cir. 2013) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S. Ct. 2485, 135 L.Ed.2d 1031 (1996) (per curiam)). Probable cause is present when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). It is to be determined by "an analysis of the totality of the circumstances," *United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004), as "viewed from the standpoint of an objectively reasonable police officer," *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L.Ed.2d 911 (1996). When conducting a warrantless search of a vehicle, law enforcement officers with probable cause are permitted to search "every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). And "this exception permits police officers to search a vehicle for evidence of any crime, not just the crime of arrest." *Baker*, 719 F.3d at 319.

*United States v. Graham*, 686 F. App'x 166, 173 (4th Cir. 2017). The "fair probability" required to support probable cause is less than a preponderance. *See United States v. Ortiz*, 669 F.3d 439, 446 (4th Cir. 2012).

---

[10] At the hearing, Wright's counsel asked to hold his argument challenging the dog's reliability in abeyance pending receipt of records concerning the dog's history of alerts. Counsel has since advised the court that the logs were provided on July 20, 2018. The court notes, however, that no evidence was presented at the hearing to call into question the reliability of the drug dog and no additional evidence has been submitted since. As the dog's handler explained, the mere fact that no drugs were found does not mean that the dog was unreliable. Instead, a dog will sometimes alert on a car despite the absence of drugs, if there is what is called a "transfer scent." A transfer scent can exist, for example, if a person came into contact with narcotics and then touched the door handle or car. Given Rodriguez-Avila's guilty plea to the distribution of narcotics and the car's earlier presence at a residence where drugs were believed to have been distributed, it is entirely possible that a "transfer scent" existed. Thus, at least based on the evidence now before the court, the dog's alert alone would provide probable cause for the search. *See United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994) ("When the dog 'alerted positive' for the presence of drugs, the officer was given probable cause for the search that followed."); *United States v. Robinson*, 707 F.2d 811, 815 (4th Cir. 1983).

Detective Medina was instructed to obtain a search warrant, which he did. He then executed the search warrant and searched the vehicle. Nonetheless, the court concludes that he had probable cause to search the vehicle at that time, even without the warrant or the dog's alert. Specifically, at the time, Medina knew the following:

- Moments before the traffic stop, the Jeep had left a house that was under active surveillance due to suspicion of drug activity and for which the police had a search warrant they were intending to execute that day, in conjunction with a number of other search warrants in the area and in other locations in Virginia and West Virginia;
- One of the occupants of the vehicle, Vicky Houghton, had an active felony warrant for drug distribution and was arrested after the vehicle had stopped;
- Another occupant of the vehicle, Blas Rodriguez-Avila, had been identified as a subject of the investigation into cocaine trafficking;
- The occupants had loaded suitcases in the vehicle, and so it appeared that they were going to leave the area;
- The vehicle was registered to Effie Houghton, and there was also an active felony arrest warrant for her on charges of narcotics distribution; and
- Moments after the Jeep had been pulled over, Medina saw another vehicle in close proximity that he recognized as being associated with the same cocaine trafficking organization.

The court finds that these facts were more than sufficient to establish probable cause because they establish a "fair probability" that the Jeep would contain evidence of a crime. *See Ortiz*, 669 F.3d at 446. Thus, Medina would have been permitted to conduct a warrantless search of the vehicle, regardless of the drug dog's reliability. Accordingly, there was no Fourth Amendment violation, and the evidence seized from the car will not be suppressed.

### III. CONCLUSION

For the reasons described above, the court makes the rulings set forth above. With regard

14

to the remaining issues in the motion to suppress, the motion will be GRANTED as to Wright's pre-*Miranda* statement, but DENIED in all other respects. An appropriate order will be entered.

Entered: October 17, 2018

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge